349 F.2d 175
 Mortimer J. DAVIS, as Trustee in Bankruptcy of Julius
Portner, d/b/aJ.P. Paint Co., Plaintiff-Appellant,
v.
NATIONAL MORTGAGEE CORP., Samuel Gruskin, Julius Portner,
Julius Portner Paint Co., Inc. and Louis Portner,
Defendants-Appellees.
 No. 492, Docket 29622.
 United States Court of Appeals Second Circuit.
 Argued May 19, 1965.
Decided July 30, 1965.
 
 Julius Zizmor, New York City, for plaintiff-appellant.
 Alfred Fayer, Hempstead, N.Y., for defendants-appellees.
 Before WATERMAN, MARSHALL and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 At the end of 1960 Julius Portner, who for fifteen years had been in the retail paint business under the name of J.P. Paint Co., found that he was insolvent, and in January of 1961 he initiated steps to work out a voluntary settlement with his creditors for twenty cents on the dollar. This endeavor came to naught, however, when the Federal Government levied upon his assets on March 15, 1961 to satisfy a $21,000 income tax liability. The assets consisted of the merchandise in the retail paint store which was in leased premises. There was some testimony that the stock, mostly paint, was worth $40,000. By March, 1961, Julius Portner was in arrears $1182.62 for rent, and therefore was in default under the lease. The landlord had commenced proceedings to dispossess him.
 
 
 2
 In connection with his plan to effect a voluntary composition of creditors, Julius Portner had negotiated for a loan from appellee, National Mortgagee Corp., of which the appellee Samuel Gruskin was president. Gruskin in this way became aware of Julius Portner's financial difficulties and of the imminent sale of the paint company's assets following the levy by the Federal Government. In February, 1961, in connection with the proposed plan of settlement with creditors, steps were taken to incorporate the business. Following the levy by the Government, Gruskin continued with the formation of the new corporation, which was given the name of Julius Portner Paint Co., Inc. Its certificate of incorporation was filed with the Secretary of State of New York on March 21, 1961. Gruskin, who was its president and sole shareholder, decided that if an arrangement could be made with the landlord for the lease to continue with the corporation as the tenant, he, individually, would bid at the tax sale of the merchandise. The landlord, however, would not agree to any assignment of the lease unless the arrears of rent were paid together with a $500 advance payment of rent for April and a security deposit for future rent in the amount of $1500. At the same time one Pintchick negotiated with the landlord for a lease of the paint store with a view to bidding in the merchandise at the tax sale and continuing the business at the same location. Evidently both Pintchick and the new corporation, Julius Portner Paint Co., Inc., placed in the landlord's hands rent for April and a security deposit of $1500, and the landlord said he would give the lease to the one who was the successful bidder for the merchandise.
 
 
 3
 The debtor's brother, Louis Portner, paid up the arrears of rent owed by the debtor. He testified that the money used for the purpose had been kept by him in a tin box in his attic, that it was money inherited by Mrs. Julius Portner from her father and that she had loaned it to her husband who turned it over to him. The debtor, Julius Portner, without consideration, assigned the lease to Julius Portner Paint Co., Inc. on March 30, 1961. The evidence does not disclose the source of the $500 payment for the April rent, but there was testimony that the $1500 deposited for security was paid by the corporation from money borrowed from the appellee, National Mortgagee Corp.
 
 
 4
 The public sale of the merchandise for the enforcement of the Government's tax levy took place on April 17, 1961. The successful bidder was the appellee, Gruskin, whose bid of $11,500 was made on his behalf by Louis Portner. The merchandise was turned over to the new corporation and the $11,500 was treated as a loan from Gruskin to the corporation. It has since been fully repaid. Pintchick had bid up to $11,000, and there were a few other bidders at lesser amounts. The landlord recognized the corporation as assignee of the old lease; and the business was continued by the corporation at the same location. There was no evidence that Julius or Louis Portner had any proprietary interest in the corporation but they continued to operate the business and managed the corporation's finances.
 
 
 5
 On August 11, 1961, Julius Portner, d/b/aJ.P. Paint Co., was placed in involuntary bankruptcy by his creditors and was adjudicated a bankrupt. The Trustee in Bankruptcy in the present action claims that the money used to resuscitate the lease and buy the merchandise at the tax sale really belonged to Julius Portner, the bankrupt, and that the appellees, principally Gruskin, acted as fronts for Julius Portner to enable him to shed his obligations and at the same time retain his business, thus defrauding his creditors. The Trustee also contends that the assignment of the lease, as part of the scheme to enable the bankrupt to carry on the business at the customary location, reduced the amounts of the bids at the sale of the merchandise because, if an assignment of the lease had been offered with the merchandise, a purchaser under those circumstances would have been able to continue the business at the same location. Judge Bruchhausen, at the close of the plaintiff-appellant's case, dismissed the complaint, which we treat as the granting of a motion for a directed verdict for the defendants, for lack of sufficient evidence to warrant submitting the case to the jury. We affirm.
 
 
 6
 With regard to the money used to reinstate the lease and purchase the merchandise, the Trustee offered no evidence to show that the money ever belonged to the bankrupt. He relies solely on suspicion, surmise and innuendoes and the improbability of the defendants' stories. While the substance of the testimony of the defendants, who were on the witness stand, may tend to strain credulity, it was for the most part an elaboration of the denials by each that any of the money came from the bankrupt. To survive a directed verdict a plaintiff must produce more than the denials of the defendants. In Dyer v. MacDougall, 201 F.2d 265, 269 (2d Cir. 1952), Judge L. Hand observed:
 
 
 7
 'Neverteless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him.'
 
 
 8
 See also Brady v. Southern Railway Co., 320 U.S. 476, 479-480, 64 S.Ct. 232, 88 L.Ed. 239 (1943); Magee v. Coca-Cola Company, 232 F.2d 596, 599 (7th Cir. 1956). The Trustee offered no evidence that the monies in question belonged to the bankrupt, and the court, therefore, properly directed a verdict against him on that issue.
 
 
 9
 The Trustee's other contention is also unsupported by any evidence. Although the assignment of the lease may well have depressed the price bid at the sale, there was no evidence that any person would have bid more, had the lease been in the hands of the bankrupt. Indeed, Pintchick bid no higher than $11,000 even though he had an agreement with the landlord under the terms of which the lease would have been his if he had been the purchaser of the merchandise. The assignment of the lease and the arrangements for continuing it with the new corporation as lessee were not made until Julius Portner was on the very point of being evicted, and it may be cogently argued that the Trustee and the creditors were no worse off because of the acquisition of the lease by a third-party than they would have been if Gruskin and the corporation had done nothing. Of course, if the continuance of the lease had been accomplished through the use of the bankrupt's own resources, the situation would have been quite different; but the Trustee was apparently unable to produce any competent evidence of this. His claim with regard to the lease is unsupported by any proof that anyone would have paid more than $11,500 for the goods if, at the same time, such a purchaser could have had the lease of the store premises. As it stands the assertion is based on speculation alone.
 
 
 10
 Judge Bruchhausen was also correct in dismissing the complaint against the defaulting defendant, Julius Portner Paint Co., Inc. The default judgment against the corporation was the subject matter of a former appeal to this court reported in Davis v. National Mortgagee Corp., 320 F.2d 90 (2d Cir.1963). This court dismissed the appeal because no final judgment had been entered below in accordance with Rule 54(b) of F.R.Civ.P., as amended in 1961. It appears neither a motion to amend the judgment was made, nor was a hearing in damages held, up to the time of the trial of the present action in the District Court. As the liability of the defendants would have been joint had any been found, the dismissal of the complaint for lack of proof disposed of the case against all defendants, including the defaulting defendant, Julius Portner Paint Co., Inc. Frow v. De La Vega, 15 Wall. 552, 82 U.S. 552, 21 L.Ed. 60 (1872); 6 Moore, Federal Practice, 55.06, p. 1819 (2d ed. 1963).
 
 
 11
 The judgment below is affirmed.