**Larry CARTER, Plaintiff,**

v.

**CARING FOR THE HOMELESS OF PEEKSKILL, INC. and Janet Foy, Defendants.**

**No. 91 Civ. 1913 (CLB).**

United States District Court, S.D. New York.

May 20, 1993.

---

Anne Golden, White Plains, NY, for plaintiff.

Edward Mills, William Mariano & Associates, White Plains, NY, for defendants.

Dr. Janet Foy, pro se.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

In this Title VII action, based on sexual harassment of a male employee by a woman who at relevant times was Chairman of the Board of Directors of the corporate employer, this Court now considers a motion by defendants for judgment in their favor notwithstanding the jury verdict, pursuant to Rule 50(b) F.R.Civ.P. The verdict was for loss of wages (back pay) in the amount of $6,100.00, the maximum recoverable under the applicable facts. Liability depends upon a jury finding of constructive discharge. A claim for plaintiff's legal fees in the requested amount of $84,000 has been presented for consideration by the Court. *See* Court Doc. No. 54.

The conduct complained of occurred prior to November 21, 1991, the date of enactment of Pub.L. 102–166 (The Civil Rights Act of 1991). Although plaintiff is an African American and Dr. Janet Foy is white, the Amended Complaint docketed September 14, 1992 does not invoke 42 U.S.C. § 1981. *See* Court Doc. No. 35.[1]

*The Parties*

At the time of the incidents complained of, plaintiff was receiving a pension from the Veterans Administration based on 100% disability. He is a reformed alcoholic and former substance abuser, divorced with at least one adult child. Defendant, Dr. Janet Foy,

1. In the Court file, the Marked Pleadings submitted by plaintiff in anticipation of trial were incorrectly docketed on December 30, 1992 as a "Second Amended Complaint." *See* Court Doc. No. 40.

is a psychologist practicing in the City of Peekskill, who specializes in marital counseling. She also is divorced with at least one adult child. While the ages of these parties do not appear in the record, both are mature adults.

Defendant, Caring for the Homeless of Peekskill, Inc., is a Not-for-Profit New York corporation also referred to by its acronym, CHOP, Inc. It was founded by PAPA, another acronym, which stands for "Peekskill Area Pastors Association". Dr. Janet Foy was the non-salaried Chairman of the Board of Directors of CHOP, Inc. a group of approximately twenty community volunteers of various faiths, races and backgrounds brought together by PAPA and the Mayor of Peekskill, all of whom served without pay. Assisted by local service clubs, the officials of the City of Peekskill, and the public, these people were successful in establishing and opening a facility known as the Jan Peek House,[2] as a shelter for the homeless of that community.

Jan Peek House provided food and shelter as well as counseling and peacekeeping functions. It had a full time paid Executive Director, operating under a budget funded primarily by contract payments (approximately $250,000.00 per year) from the Westchester County Department of Social Services, and charitable gifts.

*The Facts and Contentions at Trial*

In January 1988, Mr. Larry Carter was employed at Jan Peek House as a part-time Client Care worker, and became a full time Case Manager on May 9, 1988. This promotion was offered by Terri Powers, the salaried Director of Jan Peek House, and was based on the understanding that he would initiate training towards becoming qualified as a "C.A.C." or "Certified Alcohol Counselor", which is a trained counselor in the field of alcohol and substance abuse. *See* Plaintiff's Exs. 1, 2.

A consensual sexual relationship developed between Mr. Carter and Dr. Foy in about

September 1989. Tr. at 54–55; Plaintiff's Ex. No. 7.

From the start of his employment, Mr. Carter flourished at Jan Peek House. He served for a brief time as Acting Director of the Jan Peek House in the Fall of 1989, and was granted additional vacation days by the Board of Directors to reward him for this special effort. *See* Plaintiff's Ex. No. 8. Also, while a full-time paid employee of CHOP, he was allowed to take time off for his C.A.C. course of study. Tr. at 71.

Throughout the course of his employment at Jan Peek House, Mr. Carter received satisfactory or better performance evaluations. The corporate defendant maintained throughout this litigation that Mr. Carter was an outstanding employee, and was so regarded by his peers and by the Board, and there is no evidence to the contrary. *See e.g.* Plaintiff Exs. 3, 5, 7; Tr. at 48–49. Dr. Foy wrote a glowing recommendation and personal reference to permit him to enter the C.A.C. training program, as did Terri Powers, the Director of the Jan Peek House until mid or late 1989. Plaintiff's Exs. No. 6, 36. Mr. Carter developed additional skills working at the Jan Peek House. With tuition paid by the Veterans Administration, he successfully completed his C.A.C. accreditation shortly before his resignation dated October 15, 1990, which he claims and the jury found to be the result of a constructive discharge.

Following the resignation of Terri Powers and after a brief period during which Mr. Carter was Acting Director, the Executive Director of the shelter became Jeannette Quinn (Lardiere). The written job description of Ms. Quinn, approved by the Board of Directors, included the power to hire and fire personnel employed at the shelter. Defendants' Ex. R; Tr. 325–327, 414. Dr. Foy, as Chairman of the Board, had neither statutory nor apparent authority to hire and fire, nor did she purport to exercise such powers, which remained with the entire Board as a matter of New York law, unless expressly delegated. *See Weiss v. Opportunities for Cortland County, Inc.,* 40 A.D.2d 45, 337

---

**2.** Jan Peck was a Dutch navigator, who came to the locality by mistake and settled at what became known as Peck's "kill" or inlet, probably now McGregory Brook. He thought he was in Long Island Sound.

N.Y.S.2d 409, 337 N.Y.S.2d 409 (3rd Dept. 1972). There is no evidence that this power was ever delegated by the Board to Dr. Foy; indeed, all evidence is to the effect that only Ms. Quinn had the delegated power, and that neither the Board nor Ms. Quinn wished to have Mr. Carter resign, or to discharge him. Section 708 of the Not-for-Profit Corporation Law of New York, with exceptions not material, clearly requires that all such actions of the Board of Directors must be taken at a meeting of the board at which a quorum is present. *See* N.Y. Not–for–Profit Corporation § 708 (McKinney 1970 & Supp.1992).

The path of true love seldom runs smoothly. Mr. Carter testified that he first attempted to "break-off" the relationship with Dr. Foy in November of 1989, and again in December of 1989, because he felt that Dr. Foy was "very controlling and critical" of his participation in support groups and AA. Tr. 72–73. The couple had joint consultations, paid for by plaintiff, with Dr. James W. Walkup in November, 1989, to "identify the issues in their relationship." By plaintiff's own admission, however, Dr. Foy and he continued their tumultuous personal relationship until April or May of 1990. Tr. 72, 75. At this time, Mr. Carter advised Dr. Foy that he wanted to end the relationship, and that he no longer wanted her to attend his son's graduation from medical school or his own graduation from his C.A.C. certification program, to both of which he had previously invited her. Nevertheless, Mr. Carter testified that, in March of 1990, the two opened a joint savings account to save, in part, "for us to get married" and that sometime after their "final" break-up the two met on one or two occasions at her apartment for sex. Tr. at 74, 79, 201, 261–262; Combined Interrogatories, No. 25.

As examples of the alleged sexual harassment which followed the break-up of the love affair, plaintiff relies only on the following episodes to justify his resignation or constructive discharge.

According to Mr. Carter, on June 4, 1990, he appeared at Dr. Foy's own professional office in Peekskill to recover a passbook for the joint savings account containing funds belonging only to him, and that the two engaged in a shouting match before Dr. Foy surrendered the passbook. This incident was off the work premises, not related to his employment at Jan Peek House and, by Mr. Carter's own admission, was instigated by him in the first place. Tr. 82–83.

After this incident in Dr. Foy's professional office, Mr. Carter testified that Dr. Foy harassed him sexually when she attended his graduation from the C.A.C. certification program on June 4, 1990. The alleged sexual harassment by Dr. Foy during the graduation ceremony included her unwelcome attendance at the graduation (after having been invited, with the invitation subsequently withdrawn), her taking pictures and her kissing Mr. Carter when she presented him with a gift and flowers. Mr. Carter characterized this episode as "embarrassing." Tr. at 90. While this may have been embarrassing for Mr. Carter and may demonstrate that Dr. Foy lacked judgment in attending a ceremony to which her prior invitation had been withdrawn, this does not constitute sexual harassment in any sense in connection with the employment relationship. Mr. Carter did not even suggest that this incident had any consequence in the work place.

The next alleged incident of sexual harassment also occurred in June of 1990. Mr. Carter testified, and defendant Foy concedes, that on June 5, 1990 at 10:00 AM, Dr. Foy called Mr. Carter at work and asked him to meet over dinner that evening to reconsider their relationship. After Mr. Carter declined the invitation, Dr. Foy then suggested that he resign from his position at Jan Peek House "as a personal consideration" to her and asked him to take a one week vacation to consider his options. Dr. Foy memorialized this conversation in a memorandum of the same date. Plaintiff's Ex. 16; Tr. 91–94.

Mr. Carter acknowledged during his direct and cross examination that he was assured immediately and directly by Ms. Quinn, the Director of Jan Peek House, and also by the Board of Directors of the corporate defendant, that his job was not in jeopardy. Tr. 99, 212, 339, 343, 400, 402–403; Plaintiff's Ex. No. 25. He was further advised that Jeannie Quinn would act as an intermediary between him and Dr. Foy and that he would no longer

have to report directly to Dr. Foy, if that had ever been a requirement of his job.

Mr. Carter could cite no other examples of alleged harassment that occurred during the four month period between June 5, 1990 and October 15, 1990, the date he resigned.

Jeannie Quinn gave two week's notice of her resignation as Director of Jan Peek House, on October 1, 1990, and on the following day the Board caused her to be removed from the premises. Tr. 117–118, 121–122.

By letter dated June 11, 1990, some three and a half months before plaintiff's resignation, (Plaintiff's Ex. No. 18) addressed to the Executive Committee of the Board, Ms. Quinn responds to "the many disparaging remarks about my work performance made by the Board Chairperson [Foy] at our meeting last night" and complains:

"The issue of the personal relationship between Janet and Larry has been a difficult one for me to manage all along as it was for my predecessor. In her zeal to enhance his career, Janet has made many demands of me over the months. At her insistence, I did the paperwork to have our site approved for CAC hours; budget discussions were prolonged because she argued for a higher salary for him; I have had to intervene when Janet bypassed me concerning shelter related issues and addressed her demands/requests to Larry. Limit setting was a tricky issue because there were very blurred, at best, lines between the personal and professional boundaries between the two people.

＊    ＊    ＊    ＊    ＊    ＊

Limits should have been set on both individuals in a firmer fashion concerning what would or would not be allowed at the shelter. I pride myself on being a professional and have been most uncomfortable with the lack of professionalism evidenced on the parts of both of them. I also strive to be a fair Director to all employees. I try to express respect for everyone who works here and focus on job performance rather than personalities. I do not like everyone and am not equally comfortable working with everyone, but so long as people perform effectively within the parameters of their particular job descriptions, I shall advocate on their behalf as their supervisor. I cannot become involved in doing personal favors at the expense of the integrity of my position."

Ms. Quinn's later resignation on October 1, 1990 (Plaintiff's Ex. No. 42) differs slightly from her June 11th version:

"... I am resigning as a result of harassment and attempts to undermine my position as Director dating from June 5, 1990 when Janet Foy requested me to 'urge Larry Carter's resignation' and to 'establish a confidential file' to help her achieve this, and I refused, ..."

Mr. Carter testified that after Jeannie Quinn resigned he was required to report directly to Dr. Foy, yet he could cite no specific examples of when his job required him to do so. The uncontroverted evidence is that Mr. Carter was out sick between October 8, 1990 and the date of his resignation. *See* Plaintiff's Exs. No. 44, 45, 47. Accordingly, the only period of time in which any events relied on to constitute a constructive discharge could have occurred was between the second and the eighth of October, and there was no evidence of any incidents occurring between Dr. Foy and Mr. Carter during this period of time, except that on one occasion Dr. Foy yelled because she could not find the secretary and sent plaintiff to look for her.

▉ While there clearly was a history of sexual tension between Mr. Carter and Dr. Foy, it cannot be said that this was the result of sexual harassment in the work place. Instead, the tension was the result of a failed relationship. And in the realm of private affairs people do have the right to react to rejection, jealousy and other emotions attendant to a failed relationship.[3]

Viewing all the evidence in the light most favorable to the plaintiff and drawing all

---

**3.** On June 4, 1990, the date of Plaintiff's graduation from the C.A.C. certification program, Defendant Foy wrote a congratulatory card to plaintiff which evidences acceptance by that date of her rejection:

"This year has been very painful for me, as you know. Anger and distancing and loss of affection from you. *I'm glad it's over.* I guess I do· feel it may be worth the price we have both paid, in the end.

inferences in favor of the plaintiff, the Court finds that there was no evidence whatever before the jury that the alleged sexual harassment to which plaintiff was subjected was so pervasive or severe as to cause a constructive discharge or create a "hostile work environment" in violation of Title VII. Also lacking is any evidence that the terms and/or conditions of Mr. Carter's employment changed either when true love went out the window, or when his supervisor, Ms. Quinn, quit or was fired; indeed, plaintiff's attorney, Anne Golden, conceded the same during the trial when she stated that "he's not claiming they changed his job conditions." Tr. at 498–99; *but see* Court Doc. No. 64, Post–Verdict Letter Memorandum of Anne Golden, Esq. dated February 24, 1993.

After June 5, 1990, Mr. Carter was reporting only to Ms. Quinn, and the Board of Directors had made clear it had no intention to fire him and no desire to have him resign. Between June 5 and October 1, his former paramour neither supervised him, nor did she have any power or authority to change his job conditions, or to fire him, and there is absolutely no evidence that she purported or tried to do that. He was absent from work from October 8th until the date of his resignation, and there is no evidence of any hostile conduct or activity by Dr. Foy or anybody during the intervening period which could support a finding of constructive discharge.

The evidence demonstrates at most that between June and October, Dr. Foy wished to resume a relationship that Mr. Carter wanted to end, and eventually did end. Even if it could be shown that it had become difficult or embarrassing for Dr. Foy and Mr. Carter to work together after the end of what can only be characterized as a turbulent love affair, that simply is not enough to make out a case under Title VII.

■ To establish a "hostile environment" actionable under Title VII, the sexual harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive work environment." *Meritor Savings Bank v. Vin-*

*son,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). A plaintiff must prove "more than a few isolated incidents", and cannot rely solely on "casual comments" or trivial events and "sporadic conversation." *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986).

Just as there was no actionable level of sexual harassment, there was no constructive discharge in this case, as a matter of law. No reasonable jury could find otherwise based on the evidence, or lack of evidence, produced in this trial.

■ A constructive discharge occurs when an employer, "rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (citations omitted). As our Court of Appeals stated in *Pena:*

In determining whether or not a constructive discharge has taken place, 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'

*Id.*

For instance, in *Neale v. Dillon,* 534 F.Supp. 1381 (E.D.N.Y.), *aff'd,* 714 F.2d 116 (2d Cir.1982), the Court concluded that there had been no constructive discharge where plaintiff, a former assistant district attorney in the Nassau County District Attorney's Office, was involuntarily transferred, at no loss of pay, from a supervisory to a non-supervisory position while she was on maternity leave and the contents of her office were left in a shopping cart in the hall.

In fact, under circumstances more egregious than those described by Mr. Carter, our Court of Appeals has affirmed a district court's decision to grant a directed verdict. *Martin v. Citibank, N.A.,* 762 F.2d 212 (2d Cir.1985). In *Martin,* the Court accepted as true plaintiff's testimony that "her supervisor loudly mentioned her having been polygraphed; complaints concerning her attitude to co-workers were unfounded; her supervisor had once given her the wrong combina-

Congratulations—you should be very proud. I love you.

Janet"
(Plaintiff's Ex. No. 13, emphasis added).

tion to the night deposit box and that someone using his card had once interfered with her deposits; and that she had been required to process deposit records while serving customers." 762 F.2d at 221. Nonetheless, the Court concluded that "these incidents do not legally suffice to sustain by inference that a reasonable person would have been compelled to resign." *Id.* *See Greenberg v. Hilton International Co.,* 870 F.2d 926, 936 (2d Cir.1989) (describing *Martin* as making the law of constructive discharge in this Circuit "even more clearly unfavorable to the plaintiff.")

■ The standard for a constructive discharge is the objective one of the reasonable person, and is not altered in this case by the fact that Mr. Carter had a problem with his blood pressure. Plaintiff now argues that the change in his working environment was "the discharge (sic) of Jeannie Quinn, leading to Dr. Foy becoming his direct supervisor, and the rise in his blood pressure to a level which his cardiologist testified was unacceptable". *See* Court Doc. No. 64, Post–Verdict Letter Memorandum of Anne Golden, Esq. dated February 24, 1993. This amounts to mere suspicion that Dr. Foy, as Acting Director, might change his working conditions before a new Director could be chosen by the Board, and is an insufficient basis in law for a finding of constructive discharge.[4]

*Trial by Jury*

Both the complaint and the amended complaint in this action were endorsed with a demand for trial by jury. The case was tried prior to the March 24, 1993 decision of our Court of Appeals in *Butts v. The City of New York Department of Housing Preservation and Development,* 990 F.2d 1397 (2d Cir. 1993), which held, contrary to earlier decisions of the Ninth Circuit, that the 1991 amendments to Title VII do not apply retroactively to conduct occurring, as in this case, prior to November 21, 1991. *See Reynolds v. Martin,* 985 F.2d 470 (9th Cir.1993); *Davis v. San Francisco,* 976 F.2d 1536, 1554 (9th Cir.1992), *reh'g denied, vacated in part as moot, and remanded in part,* 984 F.2d 345 (9th Cir.1993).

*Butts* supports a suggestion that this Title VII case should not have been tried to a jury. The Supreme Court has not yet been heard from on this subject. At least in the context of whether trial by jury is to be permitted, perhaps there should be no constitutional or prudential objection to giving retroactive effect in pending cases to so much of the 1991 amendment which authorizes that remedy, since the issue is purely procedural, and effects no change in substantive rights. Whether or not a jury trial should be conducted in all pending cases obviously differs from the issue of whether punitive damages may be awarded in cases arising out of conduct prior to November 21, 1991, with the latter issue seeming to be more substantive than procedural.

Long prior to the enactment of the Civil Rights Act of 1991, this Court had considered that a Title VII action could and should be tried to a jury, although opinions of our Court of Appeals had held that there was no such entitlement. For our analysis of this issue based on dicta by the Supreme Court which might support our belief, see *Linares v. City of White Plains,* 773 F.Supp. 566, 569 (S.D.N.Y.1991).

*Conclusion*

For the reasons set forth above, if the issues of sexual harassment and constructive discharge are for trial to the Court in a pre-amendment Title VII case, then judgment in this case clearly must be for the defendants. I find that there is no evidence of any changes, deliberate or otherwise, in the job conditions of plaintiff which would force a reasonable employee into an involuntary resignation. Nor was there an "abusive work environment" within *Meritor, supra.* At most, the case presents the trivial fallout of a faded affair; a "personal request" for a resignation Dr. Foy knew she could not compel, which was promptly disowned by the Director, Ms. Quinn, who had the power to hire and fire, by the Personnel Committee of the Board of Directors, and the Board itself. The case must be dismissed for a failure of proof of the sexual harassment claim under

---

4. The evidence showed that the escalated blood pressure was perceived as temporary by plaintiff's medical providers and at least equally likely to have been caused by the wrong choice of medication.

the standards of *Meritor,* and for a failure to prove *any* material change in working conditions, let alone changes sufficiently intolerable to justify a resignation equivalent to constructive discharge.

Assuming, alternatively, that the case should in fact have been tried to a jury, or that because we did so, consistency requires that the standard of *Mattivi v. South African Marine Corp. "Huguenot",* 618 F.2d 163 (2d Cir.1980) must be applied, I find that viewing all the evidence in a light most favorable to plaintiff there is such a complete absence of evidence supporting the position of plaintiff on the issues of sexual harassment on the job as defined in *Meritor* and constructive discharge, that reasonable and fair minded jurors could not have arrived at a verdict in his favor.

There is no need to consider the numerous alternate grounds urged in support of defendants' motion for a judgment as a matter of law. .

The motion is granted. The Clerk shall enter a judgment in favor of the defendants.

SO ORDERED.