**Alice Lisa GREENBERG,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

**Phyllis Gelman, Susan R. Meredith,**
**Respondents–Appellees,**

v.

**HILTON INTERNATIONAL CO.,**
**Defendant–Appellant,**
**Cross–Appellee.**

Nos. 117, 264, Dockets 88–7400, 88–7438.

United States Court of Appeals,
Second Circuit.

Argued Sept. 22, 1988.

Decided March 17, 1989.

Rehearing Granted June 1, 1989.*

* Opinion on rehearing published at 875 F.2d 39.

Phyllis Gelman, New York City (Susan R. Meredith, New Haven, Conn., of counsel), for plaintiff-appellee, cross-appellant.

Jeffrey L. Liddle, New York City (Paul J. Shoemaker, Liddle, O'Connor, Finkelstein, & Robinson, New York City, of counsel), for defendant-appellant, cross-appellee.

Before MESKILL, PIERCE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal and cross-appeal raise several issues concerning when and under what authority it is proper for a district court to award attorney's fees or to sanction attorneys for their pursuit of frivolous claims or abuse of discovery in Title VII actions. Defendant Hilton International ("Hilton") appeals from the denial of its motion for sanctions, fees and costs. Plaintiff, whose complaint alleging employment discrimination was dismissed with prejudice on her own motion, cross-appeals the denial of her motion for sanctions against defendant. We conclude that no sanctions are warranted with regard to the filing of the claims but reverse and award sanctions under Fed.R.Civ.P. 11 for plaintiff's counsel's conduct during a second round of discovery. That round involved the production of data, at great expense to Hilton, that would be relevant only after it had been subjected to analysis by professional statisticians. Although the motions to compel production indicated that an expert would be needed and would be hired to analyze the data, plaintiff's counsel knew or should have known that no expert would be hired. Otherwise we affirm.

## BACKGROUND

This litigation began in early 1984, when plaintiff Alice Lisa Greenberg filed suit against Hilton, her former employer, alleging gender-discrimination. The case was ultimately dismissed with prejudice on the plaintiff's own motion, but only after Hilton had expended some $100,000 in legal fees and other costs in its defense. Given the nature of the issues before us, it is necessary to describe this litigation in considerable detail.

## 1. *Initiation of the Lawsuit*

In 1965, plaintiff was hired by Hilton to work in its marketing division. Prior to the events giving rise to this action, she had a satisfactory record and had received a promotion to the position of Manager of Marketing Research. In late 1980, Hilton reorganized its marketing department and changed plaintiff's title to Manager of Rate Administration and Product Support (Europe, West Asia, Africa, Asia and Pacific). Plaintiff alleged that the restructuring demoted her by forcing her to report to a superior below her previous reporting level and by otherwise altering her duties. On May 1, 1981, plaintiff resigned because of what she regarded as discourteous and degrading treatment.

After leaving Hilton, plaintiff sought unemployment insurance benefits and was denied them because she had voluntarily resigned. She also filed employment discrimination complaints against Hilton with the New York City Commission on Human Rights, which took no action, and with the U.S. Equal Employment Opportunity Commission ("EEOC"), which issued plaintiff a right to sue notice on November 15, 1983.

In February 1984, plaintiff began this action, asserting claims under the Equal Pay Act and Title VII. Her complaint alleged that she was paid less than similarly situated males, was denied a promotion and subsquently demoted because of her sex, and was thereafter subjected to such intolerable working conditions as to render her resignation a constructive discharge.

On April 9, 1984, Hilton moved for summary judgment. In support of that motion, it argued that plaintiff's Equal Pay Act claim was barred by the statute of limitations, and that plaintiff had failed to allege sufficient facts to constitute a prima facie case of either a Title VII violation or constructive discharge. By stipulation, plain-

tiff conceded that her Equal Pay Act action was time-barred as to the period prior to February 15, 1981. This reduced the maximum of potential damages on the equal pay claim to somewhere between $600 and $1200.

She also submitted two affidavits in response to the motion for summary judgment. Her first affidavit stated that she "failed to receive a promotion" that she "should have received" and that the "management of Hilton International treated [her] badly in order to force [her] to leave the company." Plaintiff also stated, "[t]he treatment I received was so painful that I could not continue to work at Hilton International." Plaintiff recounted that a male, no more qualified than she, was given a promotion for which she had applied, that her duties were curtailed so as to humiliate her, and that her new superior harassed her "openly," gave her "constant, petty orders," spoke to her "discourteously" and "often screamed" at her. The "final straw" was an order that she not leave work until 5:00 p.m., thereby causing her to miss her usual bus.

In reply, Hilton submitted an affidavit from its director of personnel, John Negroni, stating that the male who received the promotion was more qualified than Greenberg and that the changes in plaintiff's duties resulted solely from business judgments made during Hilton's reorganization. Plaintiff next submitted a Supplemental Affidavit containing information alleging that she was paid less than comparable males. On July 25, 1984, Judge Owen denied Hilton's motion for summary judgment.

## 2. *The First Round of Discovery*

Discovery by the plaintiff followed. In the early phase, plaintiff's counsel deposed three Hilton representatives and made numerous document requests. Their First Request for Production of Documents included, *inter alia*, the personnel files of thirty-one employees holding positions comparable to that of plaintiff, information concerning other allegations of discrimination against Hilton, and many other documents, letters, and memoranda covering an almost twenty-year period. Defendant objected to several requests but produced 1,000 pages of documents in response. Plaintiff's counsel moved to compel discovery of the material objected to on March 13, 1985. In her supporting memorandum, plaintiff announced that she sought information relevant to proof of a pattern and practice of gender-discrimination. Defendant objected, and after discussions between counsel and applications to the magistrate, plaintiff's requests were "trimmed down" and discovery proceeded.

Defendant thereafter produced complete personnel files of the thirty-one former or current employees whom plaintiff had identified as comparable to her. These included women managers, male managers alleged to have received promotions denied to similarly situated female employees, females supervised by one Peter Schulze (plaintiff's final superior and the cause of her alleged constructive discharge), persons supervised by plaintiff, and persons who supervised plaintiff.

## 3. *The Second Round of Discovery*

In late July 1985, after receiving the data concerning the thirty-one employees comparable to her, plaintiff's counsel initiated a second round of discovery. In this round they sought, *inter alia*, forms reporting employment patterns and changes by race, sex and other protected categories, salary records, "key personnel" lists, and documents reflecting the policy and practice of Hilton from 1965 to date with regard to severance pay, profit sharing, bonuses, and incentive compensation. Plaintiff's counsel also served on defendant a first set of interrogatories. These asked: (i) what computer-readable personnel information defendant kept; (ii) what files containing what sort of information were kept on "key personnel"; (iii) for each non-clerical employee in the central office of Hilton since January 1965, their name, sex, salary and

other compensation for each year from 1965 to the present, title, education and employment history; (iv) for promotion, transfer and termination information from 1965 on for all non-clerical employees; (v) for organizational charts; and (vi) for information on other, more narrowly-focused matters.

By late October 1985, the defendant had formulated "Answers and Objections" to plaintiff's first set of interrogatories. Defendant's response stated that: (i) its personnel information was not computerized; (ii) files on "key personnel" were irrelevant and defendant had already produced the files of thirty-one comparable employees; and (iii) plaintiff's request for basic and expanded data on non-clerical employees covering a twenty-year period was overbroad, irrelevant, and unduly burdensome. In addition, defendant agreed to produce certain documents but objected on the grounds that others had already been produced, were irrelevant and burdensome to compile, or did not exist.

Plaintiff's counsel filed a motion to compel discovery before the magistrate on February 3, 1986. Defendant made a cross-motion for sanctions under Fed.R.Civ.P. 11, 26(g) and 37. This was accompanied by an affidavit stating that plaintiff's requests for fifty-six categories of documents for persons employed over a twenty-one-year period concerned information about employees in positions not comparable to plaintiff and not relevant to her claims of gender-discrimination. The supporting affidavit claimed that collection of the requested information on terminated employees would entail a manual review of approximately 3,000 personnel files.

On February 28, 1986, plaintiff's counsel filed a third request for production of documents and a third set of interrogatories, requesting yet more detailed information. The claimed purpose of the second round of discovery was to allow plaintiff to make statistical comparisons between males and females in Hilton's central office on the ground that the thirty-one files previously obtained were too small a sample to support a statistical analysis.

Plaintiff's counsel filed a Reply Memorandum in Support of Her Second Motion to Compel Discovery, dated March 12, 1986, apparently signed by Phyllis Gelman in the name of co-counsel Susan Meredith, in which she, Gelman, admitted that she had not hired a "statistical expert" to design discovery but claimed to have "experience in presenting statistical evidence in discrimination cases" and to be "able to propound interrogatories which will lead to analyzable data." Plaintiff's counsel did indicate, however, that a professional statistical analysis of the data would be made if the discovery were granted. She thus explained in the memorandum that she had hired a "team of experts in statistical evidence" and attached a letter as Exhibit A stating their conclusions. The experts, Michael Useem and Paul Osterman, opined in the attached letter that the personnel data already obtained by plaintiff's counsel (the thirty-one employees comparable to plaintiff) "may be insufficient to perform a fully comprehensive analysis" and that to establish a pattern of employment discrimination "by commonly accepted professional standards for the analysis of employment data it is useful to have detailed personnel records on all employees in the relevant company unit of plaintiff." Useem and Osterman recommended that "all available employment information be secured on all individuals employed at any point in the 'Main Office' of Hilton...."

On March 19, 1986, Magistrate Dollinger granted plaintiff's second motion to compel discovery, covering, *inter alia,* pay, promotion and other data on all its key personnel from 1973 to the present. His decision specifically relied upon the March 12 Memorandum's claim of relevance and the experts' letter attached as an exhibit. Nine days later, plaintiff's counsel wrote to the magistrate requesting that a settlement conference be scheduled. She stated, "although plaintiff believes that the data would show a pattern and practice of dis-

crimination[,] because of her straitened financial circumstances, plaintiff would like to avoid paying for an expert to evaluate the data that the defendant will produce. Therefore, this seems to be a good time to make an attempt to settle the case."

In late March 1986, defendant responded to plaintiff's third request for production of documents and third set of interrogatories. It also appealed the magistrate's order to the district court. In a memorandum in support of its objections to the magistrate's order, dated March 31, 1986, Hilton elaborated upon its contentions concerning plaintiff's attempt to prove her case by increasing the sample size to include "key personnel." It argued that employees on the "key personnel" list were mostly high level executives, located around the globe, who are not at all comparable to plaintiff and for whom data would be irrelevant to plaintiff's action.

A settlement conference was held in April 1986. After both sides presented their positions separately to the magistrate, the magistrate suggested a settlement figure of $10,000. Defendant offered this amount, but plaintiff rejected it. In May 1986, plaintiff's counsel asserted to the district court that "additional information was needed to prepare the pattern and practice evidence" and again attached the experts' letter described above.

In the fall of 1986, the district court affirmed the magistrate's discovery order and a conference was held to discuss the mechanics of discovery. Defendant approximated that the documents in question numbered 7,000–10,000 and stated that it would be "more appropriate and efficient to produce information in a form of a chart." In November 1986, the magistrate extended the time for discovery and renewed a previously entered protective order. Defendant's counsel alleges that during this time plaintiff's counsel orally stated that the purpose for pursuing this discovery was to "obtain a higher settlement offer" from defendant.

During the early months of 1987, defendant undertook to comply with the magistrate's order regarding the second document request by compiling the data required, including that on key employees, covering the thirteen-year period from 1973 to date. In the end, the summary of data ultimately produced by defendant was several hundred pages long and was based on an examination of 8,000 pages of original data. The cost of compliance with the order exceeded $11,000. Plaintiff's counsel, however, never designated a statistician or other expert witness to examine this data. As a result, in March 1987, defendant moved for an order precluding the use of expert testimony. The magistrate granted the motion, stating that "[u]nder these circumstances there is no justification ... for permitting plaintiff at this stage to seek to put together an expert case. In any event, plaintiff has given no indication that she wishes to do so."

At a pretrial conference in June 1987, an early September trial date was set. Shortly thereafter, plaintiff's counsel asked by letter whether defendant would renew its $10,000 settlement offer, stating that:

> Ms. Greenberg would be willing to settle the case for $10,000, which would cover the defendant's liability to her for damages, attorneys' fees and costs. Given that Hilton has just spent $11,000 in attorneys' fees on its most recent motion for a protective order, it would appear that it would be to the company's benefit to bring this litigation to a close.

Defendant refused to reinstate the offer, noting that its reasons for having made the offer in the first place—in order to save the cost, time and effort of the December 1986 document production—no longer applied.

### 4. *Dismissal of the Underlying Lawsuit*

On July 30, 1987, plaintiff moved to dismiss the complaint with prejudice, pursuant to Fed.R.Civ.P. 41(a)(2). The reason given was an apparently chronic illness of plaintiff. Defendant made a cross-motion for sanctions, including costs and attorney's

fees, under Fed.R.Civ.P. 11 and 41, 28 U.S.C. § 1927, 42 U.S.C. § 2000e–5(k) (although at first defendant incorrectly cited 42 U.S.C. § 1988), supported by a lengthy affidavit by defendant's counsel, detailing time charges and disbursements incurred by defendant in the course of the litigation, totalling over $100,000. In particular, defendant sought an award of sanctions for the production of data concerning key personnel during the second round of discovery.

Plaintiff responded by filing her own cross-motion for sanctions under Rule 11. Plaintiff's counsel's affirmation stated that they had considerable experience in litigating employment discrimination cases, and listed the documents on which plaintiff's employment discrimination claim was initially based. Regarding the second round of discovery, plaintiff's counsel recounted that plaintiff's experts "estimated that a computer analysis of defendant's data and a report setting out their findings would cost plaintiff approximately $5,000" and that:

> This sum of money was very large for the plaintiff, who is living on social security. To help the plaintiff avoid incurring an unnecessary expense, plaintiff's counsel, with the help of a paralegal, analyzed the data by hand to try to determine whether a computer analysis of the data produced by defendant was likely to demonstrate discrimination. This admittedly rough analysis showed that a computer analysis would probably not find discrimination based on sex. As a result of this analysis, plaintiff decided not to go forward with a computer analysis by the experts.

On April 14, 1988, Judge Owen dismissed the action with prejudice "on the basis of plaintiff's affidavit detailing her disability and depression." The district court denied defendant's Rule 11 motion because it found that "no papers signed by counsel were submitted to [the] court in bad faith" as required for sanctions to be imposed under *Eastway Construction Corp. v.*

*City of New York*, 762 F.2d 243, 254 (2d Cir.1985), ("*Eastway I*"), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and stated: "Plaintiff clearly believed she had a valid case and pursued all angles of that case recognized under federal employment discrimination law. The fact that significant discovery was required, and that the sums at stake were small to defendant does not taint plaintiff's good faith belief in her claim."

Similarly, the district court denied defendant's motions under Fed.R.Civ.P. 41(a)(2), and under 42 U.S.C. § 2000e–5(k) (reaching the merits although incorrectly citing 42 U.S.C. § 1988), because the defendant was not the prevailing party and therefore not entitled to an award under Title VII. In addition, finding that plaintiff's claims were not wholly without merit, the court denied defendant any award under 28 U.S.C. § 1927. Hilton appeals the denial of its cross-motion for sanctions, fees and costs, and plaintiff cross-appeals the district court's denial of attorney's fees to her under Rule 11.

## DISCUSSION

We discuss first whether sanctions under Fed.R.Civ.P. 11 are appropriate with regard to the claims put forth by plaintiff and the actions of plaintiff's counsel during discovery. After finding that Rule 11 sanctions are not warranted with regard to pursuit of the claim, we conclude that sanctions must be awarded for certain conduct during discovery. We next discuss whether an award of attorney's fees may be made under 42 U.S.C. § 2000e–5(k). Although the district court applied an incorrect legal standard, we leave its ruling in place. The motion for fees under 28 U.S.C. § 1927 raises an issue identical to that leading to our award of sanctions under Rule 11 and is disposed of by that ruling.

### 1. *Sanctions Under Rule 11*

■ Rule 11 requires that, if a party is represented by an attorney, the attorney

must sign all papers submitted to the court. It further states that:

> The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

If the rule is violated, the court "shall impose upon the person who signed [the violative paper] ... an appropriate sanction...." Fed.R.Civ.P. 11. As we noted in *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir.1988), *cert. granted*, ─ U.S. ─ ─ ─, 109 S.Ct. 1116, 103 L.Ed.2d 179 "[t]he 1983 amendment to Rule 11 was intended to 'discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses.'" 854 F.2d at 1469 (quoting Fed.R.Civ.P. advisory committee's note to 1983 amendment). A showing of "bad faith" is not required where the conduct of counsel is at issue. *Eastway I*, 762 F.2d at 243. Rather, an objective standard, focusing on what a reasonably competent attorney would believe, is the proper test. *Id.* at 253; *see Calloway*, 854 F.2d at 1469-70. Where a party represented by an attorney is the target of a Rule 11 motion, however, the subjective good faith test applies. *Id.* at 1474.

Because Judge Owen denied sanctions on the basis of the subjective good faith of both plaintiff and her counsel, he applied an incorrect standard so far as Greenberg's attorneys is concerned. However, we review Judge Owen's decision not to impose sanctions *de novo*. *Eastway I*, 762 F.2d at 254 n. 7 (where question on appeal is "whether ... a pleading was groundless, we are in as good a position to determine

the answer and ... need not defer to the lower court's opinion"); *see Calloway*, 854 F.2d at 1470.

We turn first to whether Rule 11 sanctions are appropriate with regard to any of the claims put forth by plaintiff in papers signed by her counsel. In ruling on a motion for sanctions, "the initial focus ... should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings...." *Calloway*, 854 F.2d at 1470. We conclude that with regard to her gender-based discrimination, equal pay, and constructive discharge claims, plaintiff's counsel has met this standard.

■ With regard to the basic employment discrimination claim, we note that the plaintiff's "initial burden of establishing a prima facie case [under Title VII] is not onerous," *Sweeney v. Research Foundation of State Univ. of N.Y.*, 711 F.2d 1179, 1184 (2d Cir.1983) (citing *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)), and need merely be sufficient to shift the burden of production to the defendant. *See Zahorik v. Cornell University*, 729 F.2d 85 (2d Cir.1984). Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to make a prima facie case, plaintiff need only offer evidence that: (i) she is a member of a protected class—here, females; (ii) she applied for, and was qualified for, a position for which her employer was seeking applicants—namely the manager of marketing support services position; (iii) despite her qualifications, she was rejected; and (iv) after her rejection, the position was thereafter filled by a male. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Although the burden of production shifts to the defendant upon plaintiff's having established a prima facie case, the ultimate burden of persuasion remains on the plaintiff. *Id.* at 802–03, 93 S.Ct. at 1824–25.

Sanctions cannot be imposed for filing a Title VII claim so long as there is "an

objectively reasonable evidentiary basis," *Calloway*, 854 F.2d at 1470, for each of the *McDonnell Douglas* elements. Because the threshold for a prima facie case is low, sanctions may be applied only when a reasonably competent attorney would conclude that there is not an evidentiary basis sufficient to cross even that threshold. Otherwise, Rule 11 would chill not only the assertion of facially meritless claims, but also claims that are weak but potentially viable.

At the start of this action, plaintiff's counsel could reasonably believe that there was evidence sufficient to make out a prima facie case under *McDonnell Douglas* with regard to Greenberg's Title VII claim of discriminatory failure to promote. There was thus reason to believe that: (i) she was a female; (ii) she applied for the position of manager of marketing support services, which was open, and had some qualifications for the job; (iii) she was rejected; and (iv) the position was thereafter filled by a male. In defending against the motion for summary judgment, the two affidavits of plaintiff supported these allegations.

As noted in *Calloway*, "[a]n attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable." 854 F.2d at 1470. In this case, plaintiff's counsel initially had no reason to believe that the failure-to-promote, demotion claim was without a factual basis and was entitled to rely upon plaintiff's statements, particularly since much of the relevant information was within the control of the defendant. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1012 (2d Cir.1986) (attorney's reliance on client's statements reasonable under circumstances where "relevant information was largely in the control of defendants").

■ The submission of plaintiff's counsel in response to the Rule 11 motion does not illumine whether they were aware of the denial of unemployment benefits and the inaction of the Commission on Human Rights, facts viewed by defendants as undermining plaintiff's claim. Even if counsel were aware of those facts, however, they did no more than suggest that Greenberg's claim might be weak and were not enough to offset the other available facts suggesting that a prima facie case might be established under *McDonnell Douglas.* Similarly, the failure of the EEOC to act does not justify Rule 11 sanctions, particularly since Title VII contemplates individual actions after the agency issues a right to sue letter. *See* 42 U.S.C. § 2000e–5(f)(1) and (3) (1982).

■ Second, we also find the Equal Pay Act claim to be not sanctionable. Plaintiff's affidavit clearly stated the relevant facts that she performed substantially the same work, exhibited the same level of skill, effort and responsibility as males working for her employer but was paid less than the males. Again, we may assume that Greenberg conveyed this information to counsel before the action began. We recognize that shortly after the complaint was filed, plaintiff conceded that the Equal Pay claim was time-barred except for a two-month period. Although a reasonably competent attorney would have perceived this flaw before filing, it appears unlikely that defendant expended additional resources to defend against the time-barred period of this claim, particularly since the issues mirrored those in the Title VII claims. Sanctions are thus not appropriate with regard to it. *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir.1986) (sanctions not warranted where doubtful "anyone gave these claims serious consideration or devoted any significant work toward disposing of them"), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

Third, we scrutinize plaintiff's claim of constructive discharge under Title VII. We examine this claim to determine whether "a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the

extension, modification or reversal of existing law." *Eastway I*, 762 F.2d at 254. Although plaintiff's constructive discharge claim was weak from the start, we conclude that the district court's decision not to impose sanctions must be left undisturbed. The gravamen of plaintiff's constructive discharge claim was that after the reorganization: (i) she was "effectively demoted" when her duties were altered and her responsibilities were decreased; (ii) her new superior unfairly criticized her, treated her "discourteously" and "screamed" at her; and (iii) she was made to stay until 5:00 p.m. causing her to miss her usual bus. Her affidavit concluded that "the treatment [she] received was so painful that [she] could not continue to work at Hilton."

▆▆▆▆ Under Rule 11, the conduct of a signer is judged as of the time the paper is signed, and we therefore examine the law concerning constructive discharge as it existed in early 1984, when the complaint was filed. *Oliveri*, 803 F.2d at 1274. At that time, the controlling Second Circuit precedent was *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir.1983). The test set forth in *Pena* to determine whether an employee has been constructively discharged is whether the trier of fact is satisfied that " 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " 702 F.2d at 325 (citations omitted). In *Pena*, we held as a matter of law that a constructive discharge was not proven where the employee experienced a change in job responsibilities (at the same salary) occasioned by a reasonable business decision and reported that she was treated in a humiliating way by her superiors. 702 F.2d at 325. *Pena* is somewhat similar to the present case, where the plaintiff's duties were altered but not her salary. The *Pena* decision thus suggests that plaintiff would, in 1984, likely have lost on the merits of her constructive discharge claim.

Nevertheless, we do not find it "patently clear that [her] claim ha[d] absolutely no chance of success under the existing precedents" or that "no reasonable argument [could have been] advanced to extend, modify or reverse the law as it [stood.]" *Eastway I*, 762 F.2d at 254. We reach this conclusion because, although Greenberg's largely conclusory description of her treatment by Hilton does not appear to demonstrate such unreasonable conduct as to compel one to resign, Pena's treatment by her employer was even less onerous. Indeed, Pena had been the architect of much of what she claimed to be unreasonable treatment. 702 F.2d at 326. Because abstract judicial language regarding legal principles must always be qualified by the facts actually before the court, we believe that counsel must be allowed to pursue claims with factual patterns that are distinguishable in relevant matters from those of governing precedents even though the general language of those precedents seems to preclude success. Counsel in the instant matter were thus entitled to test the "so unreasonable" language of *Pena* in the context of Greenberg's somewhat more serious allegations.

We note, however, that in 1985 the law in the Second Circuit hardened in a fashion even more clearly unfavorable to the plaintiff. In *Martin v. Citibank, N.A.*, 762 F.2d 212 (2d Cir.1985), we held that an employer bank's conduct, including the employee's supervisor loudly mentioning in the presence of others the employee's having been polygraphed in the course of an investigation into wrongdoing, giving the employee the wrong combination to the night deposit box, interfering with the employee's deposits, and requiring the employee to process deposits while serving customers was not legally sufficient to sustain an inference that a reasonable person would have been compelled to resign. As a matter of law, therefore, no constructive discharge had taken place. The conduct in *Martin* is arguably more egregious than that set out in the largely conclusory allegations of the

Greenberg affidavit. Indeed, the only specifically detailed instance of mistreatment described by her involves a not unreasonable request that she not leave before 5:00 p.m. After *Martin,* therefore, plaintiff's claim in the instant matter may have lacked merit as a matter of law.

■ Because Rule 11 does not place an ongoing obligation on attorneys to withdraw papers previously filed, however, *Oliveri,* 803 F.2d at 1274–75, sanctions should not be imposed on the basis of the constructive discharge claim. In the present case, plaintiff had defeated a motion for summary judgment before *Martin* was decided, and Hilton made no attempt thereafter to renew its motion in light of *Martin* or otherwise to seek withdrawal of the constructive discharge claim based on *Martin.* We believe that counsel may not be sanctioned under Rule 11 for failing to withdraw a claim based on papers that have previously survived a motion for dismissal or for summary judgment so long as: (i) the defeat of that motion was not obtained by misleading the court; (ii) the adversary has not attempted through some means on the record to obtain withdrawal of that claim based on a change or clarification of existing law; and (iii) the claim has not been repeated in papers filed after the change or clarification of law.[1] Because Hilton did not attempt on the record to seek withdrawal of the constructive discharge claim based on *Martin,* we deny Rule 11 sanctions for asserting it.

■ We turn now to the conduct of plaintiff's counsel during discovery. In deciding whether Rule 11 sanctions are appropriate for such conduct, we focus primarily on the second round of discovery. We bear in mind that "[t]he key to Rule 11 lies in the certification flowing from the signature to a ... paper in a lawsuit" and

that "[R]ule 11 ... deals with the signing of particular papers in violation of the implicit certification invoked by the signature." *Oliveri,* 803 F.2d at 1274. Rule 11 clearly applies to both the motions and the supporting memoranda filed during discovery, as the "amended rule 11 applies to every paper signed during the course of the proceedings and not only to the pleadings." *Id.; see also* Fed.R.Civ.P. 11 advisory committee's note ("Discovery motions ... fall within the ambit of Rule 11."). Rule 11 has been violated where a signed paper has been "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R.Civ.P. 11.

■ We focus specifically on counsel's seeking the second round of discovery causing Hilton to examine 8,000 pages of documents concerning Hilton employees not holding positions comparable to plaintiff. At the time this second round of discovery began, plaintiff had already obtained detailed employment data on all thirty-one Hilton employees comparable to plaintiff. Apparently because this data failed to support her gender-discrimination claim, plaintiff's counsel argued that the thirty-one employees were too small a sample and sought more information as a basis for statistical comparisons between males and females in Hilton's central office.

Although increasing sample size does not necessarily produce more reliable statistics, *see Hazelwood School District v. United States,* 433 U.S. 299, 310–14, 97 S.Ct. 2736, 2743–45, 53 L.Ed.2d 768 (1977) (statistical analysis probative only where sample to which plaintiff is compared bears relationship to individual allegedly discriminated against); *Coser v. Moore,* 739 F.2d 746, 750 (2d Cir.1984) (overall statistics less significant where employment decisions are made

---

1. Plaintiff did file papers after the decision in *Martin* that referred to her constructive discharge claim. *See, e.g.,* Plaintiff's Memorandum in Support of her Second Motion to Compel Discovery dated February 3, 1986 ("Plaintiff alleges that she ... was constructively discharged."). Those references, however, merely characterized the nature of the action rather than reasserted the claim. Accordingly, we do not view them as sanctionable filings.

on uncoordinated and independent basis), regression analysis can often be applied to gross employment data to calculate probabilities as to whether employment decisions are based on neutral or discriminatory criteria. *Id.* at 753. Plaintiff's counsel do not contest the fact that experts must be retained to employ such analysis.

Plaintiff's counsel's March 12 and May 20 Memoranda attaching the experts' statements, as well as their letter seeking a settlement conference, however, were misleading as to their intentions regarding the hiring of an expert. In the March 12 Memorandum to the magistrate, for example, plaintiff's counsel clearly indicated that a complete statistical analysis, and not merely some "rough analysis" by counsel and a paralegal, would be made of the data. The Memorandum thus stated:

> Plaintiff did consult a team of experts in statistical evidence about the data at issue in this motion. Their conclusions are attached.... Plaintiff's expert has assured us that the numbers [data requested] represented by that time period [from 1973 on] will be adequate to support statistical analysis.

March 12 Reply Memorandum of Plaintiff at 3. Attached as Exhibit A to this Memorandum was the letter from Useem and Osterman, opining that the data already produced was insufficient for "a fully comprehensive analysis" and that the data requested was necessary to determine whether a pattern of discrimination exists "by commonly accepted *professional* standards" (emphasis added). These representations were the basis upon which the magistrate ordered the second round of discovery. He thus stated that the discovery should proceed "in view of ... the showing of relevance proffered by plaintiff, *see* Plaintiff's [March 12] Memorandum at Exh. 1 [the March 7 letter from the experts]." Thereafter, counsel sent a letter

to the magistrate requesting a settlement conference in the hope that plaintiff might avoid the cost of hiring the expert necessary to analyze the data. Finally, in a Memorandum filed May 20, 1986 in the district court opposing defendant's objections to the magistrate's order, plaintiff's counsel reinforced the misleading impression they had created. They stated, "experts concluded ... that additional information was needed to prepare the pattern and practice evidence for this case" and again attached the letter from the experts.

The district court rendered only the conclusory decision that "no papers signed by counsel were submitted to this court in bad faith." On the present record, we are unable to reconcile that conclusion with the fact that a favorable discovery ruling was obtained by counsel attaching an expert's attestation to the data's relevance for professional statistical analysis and by counsel indicating to the magistrate that an expert would be hired to analyze the data sought when no such decision had been made. At the late stage in the litigation in which this discovery was sought, counsel should have had some idea as to whether they were willing to advance such costs or whether their client, whose sole income appears to have been Social Security payments, would be able or willing to bear the cost of the expert analysis.[2] If they did not know that an expert would be hired, they were obligated either to forgo the discovery or to inform the magistrate concerning the uncertainties as to the use of the data sought.

Where data is useful only for purposes of analysis by an expert, the district court or magistrate must have assurances that such an expert will be hired before granting burdensome discovery. Unless such an expert is hired, the only effect of granting discovery is to impose a financial burden on defendants. In the instant matter, the magistrate specifically relied upon repre-

---

**2.** Plaintiff's counsel in the instant case have previously been warned that "[d]iscovery is not to be used as a weapon," *National Organization for Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D.Conn.1980), after they had filed interrogatories "generally call[ing] for herculean labors and intolerable expense in order to effect compliance." *Id.* at 276 n. 6 (citations omitted).

sentations regarding the value of such data for expert analysis and where such representations contain false statements or material omissions, Rule 11 sanctions must be awarded.

We are unpersuaded by counsel's argument that, after the data had been produced, she and a paralegal were able to use a concededly rough "hand analysis of the data" to determine that "a computer analysis probably would not find a pattern of discrimination based on sex." We have examined the several hundred pages ultimately produced by defendant. It appears that little can be discerned from this information, which relates to employees not comparable to plaintiff and often not comparable to each other, without the professional assistance of an expert statistician, the use of which is common in pattern-and-practice cases. *Cf., e.g., Coser,* 739 F.2d at 750–54 (studies, including multiple regression analysis, by several statistical experts presented in Title VII pattern-and-practice case). In any event, if plaintiff's counsel intended to use only "hand analysis" by herself and a paralegal, that intention should have been made clear to the magistrate and district court when the discovery was sought. Sanctions are accordingly appropriate.

We remand for a determination of the amount of sanctions. The award should cover the reasonable costs of assembling the data produced and attorney's fees expended in defending the pertinent discovery motions and complying with the discovery order. *Cf. Eastway Constr. Corp. v. City of New York,* 821 F.2d 121, 122–23 (2d Cir.) ("*Eastway II*"), cert. denied, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); *see also Calloway,* 854 F.2d at 1476. In calculating the total award, "the financial resources of the attorneys may be relevant," *Calloway,* 854 F.2d at 1478; *see also Doering v. Union Cty. Bd. of Chosen Freeholders,* 857 F.2d 191 (3d Cir.1988); *Oliveri,* 803 F.2d at 1281.

 With regard to whom to sanction, the March 12 Memorandum was signed by Phyllis Gelman in the name of co-counsel Susan Meredith. If these two attorneys are practicing together, they are both potentially liable. *See Calloway,* 854 F.2d at 1479. Otherwise, the court should determine responsibility for the papers in question. As a final note on Rule 11, we affirm the district court's refusal to award fees against plaintiff Greenberg herself. Appellant has failed to demonstrate that Greenberg had actual knowledge of the wrongful conduct by her counsel. She thus should not share her counsel's liability for sanctions. *Id.* at 1474.

### 2. Attorney's Fees Under 42 U.S.C. § 2000e–5(k)

Section 2000e–5(k), the attorney's fee award provision applicable to Title VII actions, reads: "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 2000e–5(k) (1982). Such fees, if awarded, would be paid by the party, here Greenberg.

In view of our disposition of this issue, it is unnecessary to address whether a defendant in an action that is dismissed with prejudice at the plaintiff's request may be considered a prevailing party for the purpose of a statutory fee award. Even if such a defendant is a "prevailing party" for purposes of Section 2000e–5(k), it is not, of course, automatically entitled to fees. The Supreme Court has condoned a "double standard" with regard to fee awards in civil rights cases. It is thus easier for plaintiffs than for defendants to recover fees to enable plaintiffs with meager resources to hire a lawyer to vindicate their rights. *Christiansburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 418–19, 98 S.Ct. 694, 698–99, 54 L.Ed.2d 648 (1978). Nevertheless, Congress also wanted to "protect defendants from burdensome litigation having no legal or factual basis." *Christiansburg,* 434 U.S. at 420, 98 S.Ct. at 700.

Unlike Rule 11, which imposes sanctions for discrete filings, Section 2000e–5(k) comes into play only after the Title VII claim has been disposed of and requires the court to assess the strength or weakness of that claim viewing the case as a whole. If plaintiff's case, viewed as a whole, was objectively "frivolous, unreasonable, or without foundation," the court should award fees even though plaintiff survived motions to dismiss for failure to state a claim or for summary judgment. *Christiansburg*, 434 U.S. at 421, 98 S.Ct. at 700. At the disposition stage, the strength or weakness of a case may be viewed as a whole. That is not true when only a motion is before the court. Cases that are ultimately viewed as frivolous may well survive motions to dismiss under a system of notice pleading that does not require factual detail and even motions for summary judgment in which the evidence may be presented in sketchy fashion and credibility may not be taken into account. Indeed, in analogous circumstances, we have affirmed an award of fees to defendants in cases that were sufficient to go to the jury. *Zissu v. Bear, Stearns & Co.*, 805 F.2d 75 (2d Cir.1986).

An award of fees need not cover the entire period of a case but may be limited to the period after events demonstrated that the case was frivolous, unreasonable or groundless. *Christiansburg*, 434 U.S. at 422, 98 S.Ct. at 700; *Hermes v. Hein*, 742 F.2d 350, 358 (7th Cir.1984) (plaintiff's suit not frivolous at outset but district court on remand should determine whether it became so at some point during the litigation). Finally, the test of frivolousness is objective rather than subjective. As stated in *Christiansburg:*

> a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.

434 U.S. at 421, 98 S.Ct. at 700.

In the present case, the district court mistakenly applied a subjective test of "good faith," and ordinarily we would remand. Given the circumstances before us, however, we believe we should affirm. A finding of frivolousness would not have been made as to plaintiff's case before our decision in *Martin*, 762 F.2d at 212, which undermined her constructive discharge claim. Without a viable constructive discharge claim, of course, plaintiff was left with only her equal pay claim that is conceded to have been worth at best $1200. Whether the case became frivolous at that time we do not address.

The second round of discovery occurred shortly after the *Martin* decision, and defendant's Section 2000e–5(k) motion is thus largely duplicative of its Rule 11 motion regarding that discovery. The sanctions awarded under Rule 11 against the attorney(s) would therefore have to be subtracted from any award under Section 2000e–5(k). *See Brown v. Fairleigh Dickinson University*, 560 F.Supp. 391, 407 & n. 7 (D.N.J.1983); *cf. Calloway*, 854 F.2d at 1474 (plaintiff should not share counsel's liability for Rule 11 sanctions unless plaintiff had actual knowledge of wrongful conduct by counsel). We believe that an award of Rule 11 sanctions for the discovery abuses in question satisfies the statutory purposes of Section 2000e–5(k) in the present circumstances and that no purpose would be served by ordering the plaintiff herself to pay fees.

### 3. *Sanctions Under 28 U.S.C. § 1927*

The district court declined to impose sanctions under 28 U.S.C. § 1927 (1982) on the grounds that plaintiff's claims were not "wholly without merit." We take a somewhat different view. Section 1927 permits an award of sanctions against one who unreasonably and vexatiously "multiplies ... proceedings." We believe the only conduct of plaintiff's counsel that fits that description is that which occurred during the second round of discovery. For purposes of this case, therefore, our Rule 11 ruling disposes of the Section 1927 issue.

### 4. *The Cross–Appeal*

Plaintiff's cross-appeal contending that she should be awarded sanctions against Hilton under Rule 11 on the basis of Hilton's motion for sanctions against plaintiff is without merit. For the reasons set forth, Hilton's motion for sanctions obviously is not a basis for Rule 11 sanctions. We therefore affirm the district court's denial of plaintiff's cross-motion.

### CONCLUSION

On the basis of the foregoing reasons, we remand for proceedings consistent with

this opinion. Specifically, we affirm the district court's refusal to impose Rule 11 sanctions with regard to the filing of plaintiff's employment discrimination claims, but award Rule 11 sanctions for plaintiff's counsel's actions during discovery, the amount to be determined on remand.