Donald A. **MULLER** and Marilyn Muller, Plaintiffs,

v.

**SHERBURNE, POWERS & NEEDHAM,**
Defendants.

No. 90 Civ. 3260 (WK).

United States District Court,
S.D. New York.

March 2, 1993.

---

ted in connection with Ms. Forgione's fee application would unfairly reveal work product in the related cases which are still pending. A cursory *in camera* review of counsel's time records did not make manifest to me that a fee application in the *Forgione* case would necessarily reveal work product; however, I cannot dismiss the possibility that work product might be compromised in the course of a fee dispute and hearing in *Forgione*. For example, if forced to justify certain hours spent on these actions, counsel might be compelled to disclose his thinking and strategy with regard to the pending cases as well as the *Forgione* action.

Lewis A. Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison, Ellyn Kessler, S. Reid Kahn, Kane, Kessler, Proujansky, Tullman, Preiss & Nurnberg, New York City, for plaintiffs.

Shira Scheindlin, Herzfeld & Rubin, New York City, for defendants.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

This case began as an action by Donald Muller ("Mr. Muller") and Marilyn Muller ("Mrs. Muller"), charging their former attor-

neys, the Boston firm of Sherburne, Powers & Needham ("the Boston firm") with malpractice. That firm counterclaimed for unpaid legal fees. We granted summary judgment for the defendants on all claims, and the Second Circuit affirmed that order. Before the Second Circuit decision had been rendered, the Boston firm moved for Rule 11 sanctions against Mr. and Mrs. Muller and S. Reid Kahn, Esq. and Ellyn Kessler, Esq., partners of the firm Kane, Kessler, Proujansky, Tullman, Preiss & Nurnberg, ("the Kane firm") which had represented the Mullers in the malpractice suit. On September 15, 1992 we granted that motion against Kahn, Kessler and Mr. Muller, but denied it as to Mrs. Muller. We ruled that the measure of damages should be all expenses incurred by the Boston firm from the moment the original complaint was filed, and referred the case to Magistrate Judge Roberts to assess those expenses.[1]

On December 18, the firm of Paul, Weiss, Rifkind, Wharton & Garrison, acting through Lewis A. Kaplan, Esq., appeared for the attorney Kahn to apply for reconsideration of our order granting sanctions. This left Kessler and Mr. Muller unrepresented with respect to the Rule 11 sanctions. We allowed Kessler to file a statement of her views as to her role in the malpractice suit, and suggested to Mr. Muller that he appear in the proceedings with or without counsel.

On December 18 we heard oral argument from all interested parties. For the reasons that follow, the order awarding sanctions is vacated in its entirety.

## BACKGROUND

Many of the relevant facts are set forth in our Opinion granting summary judgment, the Second Circuit's affirmance, and our Opinion imposing sanctions. *See Muller and Muller v. Sherburne, Powers and Needham,* (S.D.N.Y.1991) 1991 WL 210933, 1991 U.S.Dist. LEXIS 14320; affirmed without published opinion, 962 F.2d 3 (2d Cir.1992);

---

1. At all times during the foregoing proceedings the Kane firm represented Mr. and Mrs. Muller in the original malpractice action and also represented both Mullers and its own partners Kahn and Kessler with respect to the Rule 11 motion. However, on or about November 6, the Kane firm presented a motion to be relieved as counsel for the Mullers.

(S.D.N.Y.1992) 143 F.R.D. 537. Familiarity with those opinions is presumed.

Plaintiff Mrs. Muller was the owner of ten percent of the stock in a closely held corporation known as U–Vend. The remaining ninety percent was held by three other individuals. Mr. Muller owned no stock in this company, but was in its employ as a Vice President and Sales Manager. In early 1989, all four of the U–Vend shareholders decided to sell their stock to a corporation known as Vendamerica. The above-mentioned Boston firm was retained to represent U–Vend, its four shareholders (including Mrs. Muller), and its employees (including Mr. Muller) in this transaction. During the summer and fall of 1989 the Boston firm negotiated a Stock Purchase Agreement which specified the amounts the several shareholders would receive for their respective shares. Slightly more than $280,000 was assigned to Mrs. Muller, leaving about $1.4 million for distribution among the other three shareholders. It does not appear that the U–Vend employees (including Mr. Muller) were in any way concerned with these negotiations.

After the deal had been negotiated, the closing was several times adjourned to permit Vendamerica to find sufficient capital to carry out its part of the transaction. When the last adjournment was granted, it was not clear that Vendamerica was going to be successful in this endeavor.

Without notifying the Boston firm, Mr. Muller met with representatives of Vendamerica prior to the ultimate closing and negotiated his own agreement with Vendamerica whereby in exchange for investing $250,000 in that company he was to receive an ownership interest and a five year employment contract. The $250,000, was to come out of the money due Mrs. Muller, and was to serve two functions: 1) to provide consideration for Mr. Muller's contract with Vendamerica and 2) to provide Vendamerica with sufficient capital to carry out the transaction to which it had agreed.

At the closing on January 24, 1990, Lawrence Bradley, an associate with the Boston firm, was presented by representatives of Vendamerica with a letter (to which all parties have since referred to as "the January 24 letter") for the signature of Mr. Muller. This letter embodied the terms of his separate negotiations with Vendamerica and explained, among other things, that in exchange for retaining $250,000 of the money due Mrs. Muller, Vendamerica had issued to Mr. Muller an "Exchangeable Note" for the same amount. The proposed letter had Mr. Muller acknowledging receipt of that note, although he did not actually obtain it until after the closing. Bradley did not see this note until after the closing, nor did he ask to see it. Representatives of Glenfed Financial Corporation, the institution which financed this transaction, urged Bradley to verify with Mrs. Muller that she had agreed to the terms of this letter. He thereupon informed Mr. Muller that his wife should have attended the closing in order to verify her consent to this change in the terms of consideration due her for the stock. Mr. Muller telephoned his home, told Bradley that Mrs. Muller was on the line, and handed him the phone. A female on the phone assented to the terms of the letter. After this call, Mr. Muller signed the letter and the closing was completed. Mrs. Muller received $250,000 less than the amount originally specified in the Stock Purchase Agreement, and the other three stockholders received the $1.4 million to which they were entitled.

Bradley had added to the letter a paragraph signed by him which, after identifying him as Mrs. Muller's attorney, confirmed that she had consented to the reduction by $250,000 of the consideration for her U–Vend stock. The added paragraph stated:

As counsel for Marilyn Muller, I have spoken by telephone with her and she approved the above arrangement, resulting in a net payment to her of $31,048.28 instead of $281,048.28.

Sometime after the January 24 closing, Bradley learned that he had not spoken to Mrs. Muller on the phone that day, but had spoken to her daughter whom Mr. Muller had instructed to "pretend you are Mommy." Mr. Muller's employment by Vendamerica was terminated within two weeks of the closing.

### The Malpractice Lawsuit

Although it is apparent from the foregoing statement of facts that the Boston firm's obligations to Mr. Muller were strikingly different than those to Mrs. Muller, the ensuing lawsuit in no way recognized this difference. On the contrary, the complaint hardly mentioning any injury Mrs. Muller might have suffered, elaborating on Bradley's failure to advise Mr. Muller of the deficiencies in the "Exchangeable Note" and the contract of employment he thought he had obtained. In granting the motion for summary judgment and dismissing the complaint against the Boston firm, we ruled that Mr. Muller had no standing to sue because he and his daughter had deliberately entered into a scheme to deceive Bradley for the express purpose of preventing him from interfering with the deal Mr. Muller thought he had made with Vendamerica. With respect to Mrs. Muller, we ruled that any rights she may have had were effectively waived by her testimony that she had given her husband actual authority to act on her behalf in all matters relevant to the dispute, and so "she, like any principal, was bound by the actions of her agent, and has no complaint against the defendants who followed his instructions." In an unpublished Opinion dated March 9, 1991, the Court of Appeals affirmed our order.

### The Motion for Sanctions

As above noted, the Boston firm made a motion for sanctions against the two lawyers Kahn and Kessler and against their clients, Mr. and Mrs. Muller. The Kane firm represented all of those persons in opposing the motion.[2] We granted the motion against Kahn and Kessler, finding that because they both knew that Mr. Muller had deliberately deceived his attorneys, it was frivolous to advance the argument that the Boston firm had committed malpractice by failing to counsel a client who had done everything in his power to thwart its involvement. We decided to impose sanctions on Mr. Muller,

finding that his conspiracy to deceive the Boston firm and then sue for inadequate legal advice as to matters which he had withheld was within the bounds of behavior which Rule 11 is meant to proscribe. According to Mrs. Muller's testimony, she had apparently assigned to her husband all responsibility for protecting her interests in this transaction. Finding that we had "no firm conviction as to what extent, if any, she actually knew what [Mr. Muller] was doing with respect to this action," we declined to impose sanctions against her.

### The Motions for Reconsideration

The main contention on Kahn's behalf on his motion for reconsideration is that we had erroneously found him to have been aware of Mr. Muller's deception at the time he signed the complaint.

Kessler's basic contention is that as soon as the January 24 letter was presented to Bradley he and the Boston firm had an insupportable conflict between his duty to protect Mrs. Muller's interests and his duties to the three other U–Vend shareholders; and that—regardless of any obligations Bradley may or may not have had to Mr. Muller— this conflict should have been disclosed to Mrs. Muller before Bradley purported to take any further action on her behalf. Although Kessler's statement was not as clear on this point as it might have been, what essentially emerged was that Mrs. Muller's interests in this transaction were utterly diverse from those of the other three shareholders. Specifically, had Bradley interfered with the closing either by insisting that Mrs. Muller receive legal advice before relinquishing $250,000, or even by informing her that his firm had to withdraw as her counsel, the other three shareholders, who were also the firm's clients, might have lost the $1.4 million dollars that Vendamerica had undertaken to pay them.

---

2. Kessler, who by this time had left the firm, neither personally appeared or submitted any papers in opposition to the motion for sanctions. In fact, all communication between her and her former firm appear to have ceased, as demonstrated by the fact that a written settlement offer by the Boston firm to withdraw the motion for sanctions for $30,000, instead of the $91,000 it was demanding, was rejected by her former partners without ever having been even divulged to her. (Kessler Aff. in Response to S. Reid Kahn's Motion, p. 2).

## DISCUSSION

■ With respect to Kessler, her argument shed new light on a possible justification for the malpractice action against the Boston firm. She for the first time emphasized the importance of viewing Mrs. Muller as an individual with discrete interests at stake in this matter[3]. As lawyer for Mrs. Muller, Kessler had at least an arguable case that the Boston firm's conflict of interest had prevented Mrs. Muller from receiving adequate legal representation at the stock purchase closing. Not having heard how the Boston firm might have answered Kessler's newly emphasized contention, it is impossible to say whether a malpractice action based on this articulated theory would have been any more successful than the one that had actually been brought. But by no stretch of the imagination could we find that such a suit would have been frivolous. Indeed, a clear focus on the Boston firm's failure to give Mrs. Muller proper counseling might have dissuaded us from finding that she had been estopped by her ratification of her husband's conduct.

■ This brings us to several questions. First, as Kessler's newly emphasized theory only justifies an action on behalf of Mrs. Muller, should she be sanctioned for naming Mr. Muller as an additional plaintiff? If we could imagine a single strategic reason for Mr. Muller's inclusion in this suit, we might well leave standing the sanctions against Kessler. However, no such reason is apparent. Had the malpractice action been successful, Mrs. Muller would undoubtedly have been entitled to liquidated damages amounting to the $250,000 she had not received for her stock. Mr. Muller, on the other hand, would at most have had a claim for lost wages, which he would have had to mitigate by getting other employment. It is therefore obvious that adding Mr. Muller as a plaintiff in no way changed the contour of the lawsuit, except to insure its defeat. Looking at it from the Boston firm's point of view, this addition increased neither the expense nor difficulty of defending this action. We know of no authority suggesting that such harmless misconduct should result in sanctions.

■ The next question is whether Kahn, who had failed to recognize which of his clients had a valid legal claim, should benefit from the legal theory suggested by Kessler. In determining whether the signer of a complaint has violated Rule 11, we focus not on the signer's good faith or lack of it, but are to apply an objective standard of reasonableness. *Greenberg v. Hilton Intern. Co.*, (2nd Cir.1989) 870 F.2d 926, 934. The Court there observed that "an objective standard, focusing on what a reasonably competent attorney would believe, is the proper test." 870 F.2d at 934. We are persuaded that "a reasonably competent attorney" in Kahn's position would have believed that a valid claim existed on behalf of one of his clients, and that no one was injured by the addition of an extra plaintiff. We must therefore conclude that sanctions were also inappropriate as to him.

■ With respect to Mr. Muller, although there is dispute as to when Kahn first learned of the duplicitous conduct which we found to disqualify one of his clients, that dispute concerns only the time when the client was asked about his misrepresentation at the closing. It is not suggested that Mr. Muller ever did, or attempted to, affirmatively mislead anyone in the Kane firm. We therefore conclude that the order imposing sanctions on him must also be reversed. *See Friedgood v. Axelrod*, (S.D.N.Y.1984) 593 F.Supp. 395, 395.

## CONCLUSION

For the foregoing reasons, the motions for reconsideration are granted. Rule 11 sanctions are withdrawn against Kessler, Kahn and Mr. Muller.

SO ORDERED.

---

3. As we observed at page 7 of our opinion dismissing the malpractice complaint, "counsel for both parties have confused the issues by referring to the Mullers collectively as 'plaintiffs'" despite the fact that "each had an independent relation with [the Boston firm]." Ignoring this observation, the Kane firm's subsequent appeal to the Court of Appeals kept referring to "the plaintiffs" as a unit and was exclusively focused on injuries claimed to have been suffered by Mr. Muller.