**Ida GELER, Israel Geler, and Yacof Geler, Plaintiffs,**

v.

**NATIONAL WESTMINSTER BANK USA, Defendant and Third-party plaintiff,**

v.

**Howard GLUCKMAN, as administrator of the last will and testament of Susana a/k/a Shoshana Ghitelman, Third-party defendants.**

**NATIONAL WESTMINSTER BANK USA, Plaintiff,**

v.

**Howard GLUCKMAN, as administrator of the last will and testament of Susana a/k/a Shoshana Ghitelman, Ida Geler, Israel Geler, and Yacof Geler, Defendants.**

**Nos. 90 Civ. 6840 (RLC), 90 Civ. 1354 (RLC).**

United States District Court, S.D. New York.

Sept. 1, 1992.

Anderson Costigan, New York City, for the Gelers; William F. Costigan, John P. McConnell, of counsel.

Winston & Strawn, New York City, for Nat. Westminster Bank USA; Edward N. Meyer, Michael E. Cavanaugh, Michele Viola, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Benjamin Ghitelman, an Israeli national, maintained for a number of years a checking account and several certificates of deposit in defendant's International Private Banking Division. On June 29, 1987, Benjamin and his wife Susana appeared personally at the bank. They met with Esther Obadia, the bank official who handled the Ghitelman accounts, and requested that the accounts be made joint with his wife. A signature card was signed by both Benjamin and Susana to enable each to effect transactions independently. About a year later, on June 21 and June 27, 1988, Benjamin purchased two certificates of deposit for approximately one quarter of a million dollars each, one listing his wife as beneficiary and the other listing the Gelers as beneficiaries. In or about July, 1988, he ordered the bank to combine these two certificates into one with only the Gelers now listed as beneficiaries.

On August 23, 1989, Susana and her daughter appeared at the bank. Susana told Obadia that her husband was ill and that she wished to redeem the July, 1988 certificate of deposit. Obadia permitted her to do this, and the funds, totalling $489,000, were transferred to Susana's account at Bank Hapoalim in Zurich, Switzerland. In November, 1989, Yacof Geler appeared at the bank with the customer copy of the July, 1988 certificate of deposit seeking the proceeds. The customer copy showed the Gelers listed as beneficiaries of the certificate.

The bank then learned that when Susana visited the bank on August 23, Benjamin was not ill, as Susana had advised, but that he had died on August 9, 1989. Obadia contacted Susana in Israel and persuaded her to return the funds to the bank, which she did on December 6, 1989. Shortly thereafter Susana died.

Defendant placed the returned funds in a certificate of deposit naming Susana as owner. The Gelers were not advised that the funds had been returned, nor were the funds released to the Gelers. In apparent reliance on the joint signature card, the bank, through Constantine Despotakis, its vice president and in-house counsel, took the position that the funds belonged to Susana. The bank did not take the usual action when faced with actual or putative adverse claims: file an interpleader complaint, deposit the funds in court and have the rightful owner of the funds determined by the court.

After the visit of Yacof Geler, Despotakis wrote to Mark Kalish, counsel for the Gelers, explaining that he had reviewed the file with the account officer; that the Ghitelmans had come to the bank together on June 29, 1987, and advised the bank that "all their accounts, including time deposits, with the bank should henceforth be joint ..." (Ltr. dated 11/22/89 from Constantine Despotakis to Mark Kalish, Esq., Ex.E. to Affidavit of William Costigan in support of Motion for Rule 11 sanctions).

Despotakis spoke with Susana Ghitelman's daughter, a Mrs. Jacobi on January 23, 1990 by telephone. In that New York-to-Israel telephone conversation, Despotakis told Jacobi that it was the bank's position that the certificate of deposit proceeds were jointly owned by the Ghitelmans, and advised her to discuss the matter with her attorney to determine whether to challenge the Gelers or settle with them. (Memo 1/24/90 Despotakis to Obadia, Ex. H to Costigan Affidavit).

On March 22, 1990, Despotakis wrote to Joshua Eilberg, Esq., in response to an inquiry from Eilberg to Obadia concerning the Gelers' claim. Despotakis enclosed his earlier letter to Kalish and went on to explain that it was the bank's position, "based on its records that all the Ghitelman accounts became joint as of June 29, 1987, when Mr. and Mrs. Ghitelman personally visited the Bank to so instruct accordingly. It was only through clerical error that the certificate of deposit and the Bank's internal application control sheet, both of which were typed up after this change, omitted Mrs. Ghitelman's name. Consequently, the certificate of deposit became the sole property of Mrs. Ghitelman upon Mr. Ghitelman's death. At Mrs. Ghitelman's subsequent death, the proceeds ... would then

belong to the beneficiaries.... At any rate, this is an issue between the estate representative of Mrs. Ghitelman and the named beneficiaries on the certificate of deposit." (Ex. I to Costigan Affidavit).

Lisa Miller, an attorney for Mrs. Ghitelman's heirs, stated in a letter to Despotakis dated September 7, 1990, that she had on his advice written a strong letter to Costigan, counsel to the Gelers, and asked Despotakis to review her letter and to suggest any changes. (Ex. J to Costigan Affidavit). Despotakis responded to Miller on September 11, 1990, suggesting modifications in the proposed letter to Costigan. (Ex. L to Costigan Affidavit). Miller adopted these suggestions in a letter to Costigan dated September 12, 1990 in which she sets forth Despotakis' position that the Ghitelman account was joint and that the Gelers had no right to the proceeds of the certificate of deposit. (Ex. K to Costigan Affidavit).

The court held an evidentiary hearing on the matter and filed an opinion, dated December 4, 1991, ordering the certificate of deposit which was the subject of the controversy turned over to the Gelers as rightfully theirs. The Gelers now seek Rule 11 sanctions against National Westminster Bank USA and Despotakis. Plaintiffs contend that any reasonable inquiry into the bank's own records and procedures would have made manifest that the certificate of deposit belonged to the Gelers. Plaintiffs assert that the bank and Despotakis misrepresented their own records, delaying for two years receipt by the Gelers of the proceeds of the certificate of deposit and causing them to expend $82,493.52 in attorney's fees and $9,151.20 in disbursements, when the proceeds of the certificate of deposit should have been turned over to them without delay or the need for litigation.

## DETERMINATION

■ Rule 11, F.R.Civ.P., requires any pleading, motion, or other paper filed with the court to be signed by a lawyer or party, and then provides that

  [t]he signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Under *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985), Rule 11 is violated when "after reasonable inquiry, a competent attorney would not form a reasonable belief that the pleading is well grounded in fact...." Since the Rule states an objective standard, the attorney's subjective "good faith" belief in the viability of his claim provides him no "safe harbor" from sanctions. *Id.* at 253; *accord Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 934 (2d Cir.1989). In determining whether the rule has been violated, courts must strive to avoid the wisdom of hindsight, *Eastway Constr., supra,* 762 F.2d at 254, since Rule 11 is aimed at situations where it is absolutely clear that the claim has no chance of success. *Motown Products, Inc. v. Cacomm, Inc,* 849 F.2d 781, 785 (2d Cir.1988); *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Further, Rule 11 "does not license a district court to sanction any action by an attorney or party that it disapproves of. Imposition of sanctions must be based on a pleading, motion or other paper signed and filed in federal court...." *McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 22 (2d Cir.1990) (citations omitted).

■ In this case the Gelers assert that the answer filed by Despotakis and the bank did not conform to the Rule's requirement that a reasonable inquiry into the facts of the case be made before filing. The court agrees that the bank's answer contained at least two statements which could not have been the result of the re-

quired reasonable inquiry into the facts of the case.

First, in giving the general background of the bank's relationship with Benjamin Ghitelman, the answer states that "the account relationship, at the request of Mr. Ghitelman, was on an overall 'do not mail' basis. Mr. Ghitelman, over the years, purchased a variety of certificates of deposit.... In the vast majority of cases, Mr. Ghitelman would telephone his investment instructions for such certificates of deposit to the bank's international private banking representative who serviced his account. The procedures for establishing each certificate of deposit were in keeping with Mr. Ghitelman's foreign status and 'do not mail' instructions." This statement was false, and a reasonable inquiry into the bank's records and operating procedures would have revealed this to Despotakis.

Second, the answer states that "[i]n a visit to New York on June 29, 1987, Benjamin ... and Susana Ghitelman met with Esther Obadia, their ... account officer ... [and] Mr. Ghitelman specifically directed that his accounts, both checking and certificates of deposit, also known as time deposits or TD's, should be joint with his wife, Susana Ghitelman." That statement was also false, and a reasonable inquiry into the documentary evidence in the bank's possession and the memories of the relevant bank employees would have demonstrated as much to Despotakis.

The testimony at the evidentiary hearing established that, according to bank procedures, certificates of deposit can be rolled over or renewed in telephonic communications, but the issuance of a new certificate or any change in title or beneficiary on a certificate requires the separate written instructions of the customer. In these instances bank procedures require that an application be filled out by a bank official mirroring the customer's written instructions. The application is then checked against the customer's written instructions by a bank official other than the one who filled out the application. The certificate is then issued in accordance with the application, and a copy of the certificate is mailed to the customer.

In this case the bank's copy of the Ghitelman's instructions was lost. However, the bank still had the time deposit application which showed that the certificate was in trust for the Gelers, not jointly held by Benjamin and Susana Ghitelman. At the evidentiary hearing, Obadia and Robert McGrath, the bank officials most conversant with the workings of the International Private Banking Division, had no difficulty in concluding that the July, 1988 certificate in trust for the Gelers had been so designated on Benjamin Ghitelman's specific and expressly written instructions. Obadia's confidence in that regard was reinforced by the fact that the Gelers' names had not heretofore been mentioned in any of the Ghitelman transactions.

These officials testified that the only purpose of the signature card, which Despotakis viewed as critical, was to certify who could withdraw from the account. Pursuant to the bank's standard operating procedures, Benjamin's specific written instructions concerning the certificates of deposit, given after the filing of the joint signature card, were controlling as to ownership of the accounts.

Moreover, Obadia does not remember what Benjamin told her at the June, 1988 meeting, contrary to the assertion made in the bank's answer. (Obadia deposition at 209–210, Ex. B to Costigan affidavit). There are also notations by Obadia made contemporaneously with the June meeting of standing instructions meaning "whatever the instructions were [prior to the meeting], we had to continue them". (*Id.* at 212–214). Obadia also testified that when she allowed Susana to withdraw the proceeds of the certificate of deposit in issue, she had not seen a copy of the certificate. If she had seen that the certificate did not have Susana's name on it, Obadia would not have permitted early redemption of the certificate by Susana. These facts, coming as they do from the bank's own employees and documents, would have been known to Despotakis before he filed the bank's an-

swer if he had bothered to make a reasonable inquiry into the facts of the case.

Despotakis apparently concluded that the joint signature card meant that the Ghitelman's time deposit accounts were jointly owned, and proceeded to oppose the Geler's claim to the certificate on that basis. A reasonable inquiry into the bank's procedures would have shown this to be an erroneous conclusion. This error could have been avoided if Despotakis had checked the accuracy of his position with either McGrath or Obadia. Therefore the court must conclude that Despotakis did not make a proper inquiry before filing the bank's answer.

Since Despotakis failed to conduct a reasonable inquiry into the facts of the case before filing the bank's answer, sanctions under Rule 11, F.R.Civ.P. must be imposed. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990) ("An attorney who signs the paper without such a substantial belief 'shall' be penalized by 'an appropriate sanction.'"). The remaining question is what sanction is appropriate.

The Gelers claim that Despotakis' failure reasonably to investigate the facts of the matter before filing his answer required them to prosecute a lawsuit that should have been resolved immediately. Accordingly, they seek reimbursement for the attorney's fees incurred in bringing the litigation.

Despotakis' action has certainly required the Gelers to expend more time and probably to incur greater expenses than would have been necessary had the matter proceeded immediately as an interpleader action. First he told the Gelers that the certificate was rightfully the property of Susana's heirs and dismissed their claim as inconsequential. Even after the Gelers instituted the instant action, Despotakis continued the posture of protecting Susana's heirs as the rightful claimants. In conferences with the court, Despotakis steadfastly resisted following the court's suggestion that he file an interpleader action, deposit the money in court and request the court to determine to whom the proceeds of the

certificate should be distributed. Instead, he asked the court to dismiss the Geler complaint, stay the action until Susana's estate intervened, or require the Gelers to join the estate as an indispensable party. It was only on the entry of outside counsel that the bank adopted a neutral position in the matter.

The bank cannot be faulted, however, for not turning over the proceeds of the certificate to the Gelers immediately, in light of the fact that Susana had claimed the funds. While Susana's return of the money immediately upon being asked to do so by Obadia suggests to the court that she implicitly recognized that she had no right to the funds, the bank was not required to reach this conclusion. There could have been many other explanations for her action. Indeed, given Susana's sudden death, her illness could be an equally plausible reason for what occurred. The proper course for the bank was the interpleader action, which it eventually filed. Prudence dictated having the matter settled by a court. *See, e.g., Krishna v. Colgate Palmolive Co.*, No. 90 Civ. 4116, 1991 WL 125186, 1991 U.S.Dist.Lexis 8912 (S.D.N.Y., July 2, 1991) (Haight, J).

Accordingly, the Gelers would have had to secure the services of a lawyer to vindicate their claim in an interpleader action in any event. Nonetheless, without Despotakis' stonewalling of the Gelers and his seeking to protect the interests of the heirs to Susana's estate, the matter undoubtedly would have moved to an earlier resolution, particularly in light of McGrath's and Obadia's testimony as to the bank's standard operating procedures.

Without Despotakis' violation of Rule 11, the Gelers' litigation costs would have been somewhat less than what they were actually required to expend in attorney's fees and disbursements. However, since the attorney's fees were on a contingency basis, that figure would have remained unchanged and the savings realized by the Gelers would have been largely in disbursements. Nevertheless, Rule 11 sanctions are not primarily aimed at reimbursing the victim for whatever extra funds he was

required to expend because of the infraction, but to disciplining the violator who filed papers in court without having made a proper inquiry into the facts or law. The loss to the victim nevertheless helps the court in determining what is a reasonable sanction in the circumstances of this case.

Sanctions which require the bank to reimburse the plaintiffs for all of their expenses and one third of their attorney's fees seem adequate and reasonable. Judgment is accordingly entered against the bank and Despotakis for plaintiffs' disbursements in the sum of $9,151.20, and for attorneys fees in the sum of $27,500 for a total judgment of $36,651.20.

IT IS SO ORDERED.